LEVINSON, Judge.
Respondents mother and father appeal from orders terminating their parental rights in their minor children "Ivan" and "Cathy."[1] For the reasons that follow, we reverse and remand.
Petitioner Chatham County Department of Social Services (DSS) filed a petition for termination of respondents' parental rights as to Cathy on 14 October 2002. The petition asserted that father had abused, neglected, and abandoned Cathy, and specifically that he: had sexually abused Cathy; had exercised improper discipline of Cathy; had frightened her by driving past the foster home where she resided; had not sought any sex offender counseling; and had notattended court appearances or contacted DSS regarding Cathy. Petitioner asserted that mother had neglected and abandoned the child, and specifically that she: did not believe father had abused Cathy or her sisters; continued her relationship with father; had improperly disciplined Cathy and allowed others to do the same; did not "follow up" with the reunification plan, attempt to improve her parenting skills or to learn more about Cathy's needs; scared Cathy by driving past her foster home; visited regularly with Cathy but "did not show progress" at the visits in her ability to "provide the nurturing" Cathy needs; and had little recent contact with DSS.
Also on 14 October 2002, DSS filed a petition to terminate respondents' parental rights in Ivan. This petition asserted the same grounds for termination of mother's parental rights in Ivan as for Cathy, in virtually identical language. The only difference was that, instead of alleging that Ivan was sexually abused, the petition alleged that his siblings were abused. The petition asserted that father had neglected and abandoned Ivan, but did not allege abuse. Again, the recitations are the same as in the petition for termination of parental rights in Cathy, except for alleging abuse of Ivan's siblings, rather than of Ivan himself. The respondents filed answers denying the material allegations of the petitions.
On 11 June 2003, the trial court entered orders terminating parental rights of both respondents in Ivan and Cathy. Each of the termination of parental rights orders, one concerning Ivan and the other Cathy, contains forty-four identical "findings of fact." Thefirst thirty-two findings are designated "History of the Case Prior to Adjudication Hearing." These findings generally outline the procedural history of the case, and recite what various people, including the GAL, children, mental health professionals, DSS officials and others "reported", "concluded", "said", "observed" or "believed" at various intervals during previous years. These thirty-two findings also set out certain background information pertaining to siblings of the minor children.
Findings of fact thirty-three through forty-four of each order are designated "Findings Based on Evidence Presented at the [Termination of Parental Rights] Hearing." We conclude that the underlined portions of these "findings," which are set forth below, do not constitute actual findings of fact.[2] Instead, these underlined portions are summaries of the observations and conclusions drawn by others that do not resolve conflicts in the evidence or state what facts the trial court finds to be true; they merely recite what some other person has asserted.[3] Thus, these underlined portions are not considered in our analysis. Following are the "FINDINGS BASED ON EVIDENCE PRESENTED AT THE TPR HEARING":33. Maria Soto worked with [mother] for a three month period between March and June 2002, to assist her in understanding how the system works, how to reach out to the system, how to access support and services. Ms. Soto observed that she obviously cared for her kids. [Mother] professed not to understand why her visitation with the children was suspended. Ms. Soto told her she needed to cooperate with DSS recommendations, and that she needed to be honest. [Mother] continued to deny any knowledge of [father's] whereabouts. She also continued to say "she really didn't think it (the sexual abuse of her daughters) had happened." After June 2002, Ms. Soto no longer worked with [Mother].
34. Dr. Maria Lapatina testified that in her twenty years of work as a therapist in North Carolina this case was "very difficult . . . the most frustrating case in her life." [Mother] NEVER had an understanding of why her girls had been taken. She denied everything, even though the evidence was right in front of her. (She told Dr. Lapatina that the doctors in Chapel Hill had reported that her girls were fine.) Dr. Lapatina further testified that she used everything in her power to show [mother] that her girls were in serious emotional turmoil. [Mother] continued to maintain that the girls were lying; it never happened.
35. Dr. Lapatina had observed visitation between [mother] and her children with Maria Soto present. [Mother] showed no affection to the children. There was no communication at all between mother and children. [Cathy] reached out to get some attachment but it didn't happen. [Mother] would not show "a minimum affection." She told Dr. Lapatina that [father] was back in Central America.
36. [Father], ordered to have no contact with the children until he had enrolled in a sex offender evaluation, continues to deny any sexual inappropriateness with his daughter and stepdaughters. He did not complete any evaluation or treatment. He has been uninvolved in the children's lives since their removal and continues to blame Chatham County DSS for placing the children in care. He denies driving with his wife to the foster home when [mother] approached [Cathy]. It was during the period of time when he was observed driving [mother] to the visitation with [Cathy and Ivan] that [mother] was telling DSS that she did not know where he was.
37. [One of the sibling's] whereabouts remain unknown. [Another sibling] was located in October 2002. She had given birth to a daughter one month earlier and is living with the family of the child's father.
38. [Cathy and Ivan] were placed in a different foster home following the continued appearances of their parents in the vicinity of the previous placement.
39. [Cathy] celebrated her 11th birthday in January 2003 and has made a good adjustment to her new home. Her GAL reports that she has been doing well academically, enjoying Girl Scouts and other school-related activities. She has sometimes struggled with "sadness over leaving her previous foster family and her residual feelings of guilt over the loss of her birth family and her ambivalent feelings towards her father." [Cathy] would like to be adopted by the family she is now living with.
40. [Ivan] has been doing well in his new school and is enjoying extracurricular activities, according to his GAL. He only speaks negatively about his biological parents. He does not admit to missing anything about his life prior to being taken into foster care.
41. [Mother] testified during the Disposition Phase of this hearing that she did not want to have therapy with Dr. Lapatina. She denies that she was not affectionate with her daughter [Cathy]. She says she would stay away from [father] if ordered to do so. Asked if she sees him regularly, she responded "Siler City is a small town." She works 40 hours a week. She wants her kids back.
42. This court is not able to determine whether [mother's] consistent denial of the sexual abuse of her three daughters by [father] is due to an ongoing lack of understanding or a refusal to face the truth.
43. [Mother's] frustration with DSS and the court system notwithstanding, she has not only failed to take advantage of virtually every path to reunification offered to her; she has acted with utter disregard for the recommendations made by Maria Soto, Dr. Maria Lapatina, numerous social workers, the children's guardian ad litem, Dr. Diana Meisburger, and Nancy Berson among others-either ignoring the advice of these professionals or lying to them.
44. The sad chronologies of [two older siblings] bear witness to [mother's] unwillingness or inability to adequately care for her children and provide a compelling indication of the problems that would await [Cathy and Ivan], were these children now placed with her.
(underlining added). Neither of the identical orders on termination of parental rights incorporated prior adjudication orders by reference, relied on specific factual findings set forth in prior adjudications, or included prior adjudications among the documents the trial court listed at the beginning of the termination order as having been reviewed by the trial court.
The court found that grounds existed to terminate father's parental rights in both children on the basis of abuse, neglect, and dependency. The court found grounds to terminate mother's parental rights in the children on the basis of neglect and dependency. The court did not rule on the petitioner's allegations of abandonment. From these orders respondents appeal.
Standard of Review
A termination of parental rights proceeding is conducted in two stages. The first of these, adjudication of the existence of grounds for termination, is governed by N.C.G.S. § 7B-1109 (2003). During adjudication, the trial court "shall take evidence, find the facts, and shall adjudicate the existence or nonexistence of any of the circumstances set forth in G.S. [§] 7B-1111 which authorize the termination of parental rights of the respondent." G.S. § 7B-1109(e). The petitioner has the burden of proving by clear, cogent, and convincing evidence the existence of one or more of the grounds for termination as alleged in the petition. G.S. § 7B-1109(f). If petitioner succeeds in proving that grounds exist for termination of parental rights, the proceeding enters the disposition phase, governed by N.C.G.S. § 7B-1110 (2003). Upon afinding "that any one or more of the conditions authorizing a termination of the parental rights of a parent exist, the court shall issue an order terminating the parental rights of such parent . . . unless the court shall further determine that the best interests of the juvenile require that the parental rights of the parent not be terminated." G.S. § 7B-1110(a). "On appeal, the trial court's decision to terminate parental rights is reviewed on an abuse of discretion standard, and we must affirm where the court's findings of fact are based upon clear, cogent and convincing evidence and the findings support the conclusions of law." In re J.L.K., __ N.C. App. __, __, 598 S.E.2d 387, 391 (2004) (citations and internal quotation marks omitted).
Dependency as Ground for Termination
Certain issues are raised by both respondents, and may be resolved by applying the same analysis to both. The first of these is the trial court's conclusion that dependency was a ground for the termination of parental rights of both respondents.
The court concluded that grounds existed for termination of parental rights of each respondent "pursuant to N.C.G.S. § 7B-1111(a)(6) in that [the respondent] is incapable of providing for the proper care and supervision of the child, such that the child is a dependent child within the meaning of N.C.G.S. § 7B-101(9) (2003), and there is a reasonable probability that such incapability will continue for the foreseeable future." N.C.G.S. § 7B-1111(a)(6) (2003) provides, in relevant part, that the trial court may terminate the parental rights upon a finding . . . [t]hat the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. [§] 7B-101, and that there is a reasonable probability that such incapability will continue for the foreseeable future. Incapability under this subdivision may be the result of substance abuse, mental retardation, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement.
G.S. § 7B-101(9) defines a dependent juvenile as "[a] juvenile in need of assistance or placement because the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or whose parent, guardian, or custodian is unable to provide for the care or supervision and lacks an appropriate alternative child care arrangement."
Upon review of the record we conclude that the trial court erred in its conclusion that dependency was a ground for termination of parental rights. First, dependency was not alleged in the petitions for termination of parental rights, either by statutory reference or by alleging facts that would support such a conclusion or would put the respondents on notice that dependency was alleged. See In re Humphrey, 156 N.C. App. 533, 539, 577 S.E.2d 421, 426 (2003) (holding that factual allegations in a petition to terminate parental rights were sufficient to put respondent on notice as to allegation of neglect). Moreover, neither the evidence at the hearing nor the court's findings of fact address the respondents' ability to care for the childrenwithin the meaning of G.S. §§ 7B-1111(a)(6) and 7B-101. We conclude, therefore, the trial court erred in its conclusion that dependency was a ground for termination of parental rights as to both respondents.
Abuse and Neglect as Grounds for Termination
We next consider the trial court's conclusions regarding abuse and neglect as grounds for termination of parental rights. The court concluded that both respondents had neglected the children, and that respondent father had also abused them. G.S. § 7B-101(1) defines an abused juvenile as a juvenile whose parent
a. Inflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means;
b. Creates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means;
c. Uses or allows to be used upon the juvenile cruel or grossly inappropriate procedures or cruel or grossly inappropriate devices to modify behavior;
d. Commits, permits, or encourages the commission of a violation of the following [enumerated sexual offense laws];
e. Creates or allows to be created serious emotional damage to the juvenile . . . ; or
f. Encourages, directs, or approves of delinquent acts involving moral turpitude committed by the juvenile.
Under G.S. § 7B-101(15), a neglected juvenile is defined as
[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; . . . or who lives in an environment injurious to the juvenile's welfare. . . . In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile . . . lives ina home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.
Regarding neglect, case law has interpreted the statute to require that "[a] finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." In re Young, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997) (citation omitted). Further, "[t]o prove neglect in a termination case, there must be clear, cogent, and convincing evidence (1) the juvenile is neglected within the meaning of [G.S. §] 7B-101(15), and (2) the juvenile has sustained some physical, mental, or emotional impairment or there is a substantial risk of such impairment as a consequence of the neglect." In re Beasley, 147 N.C. App. 399, 403, 555 S.E.2d 643, 646 (2001) (citation and internal quotation marks omitted).
In the instant case, the gravamen of the petitions for termination of the respondents' parental rights was that: (1) respondent father had sexually abused Cathy and her sisters; (2) respondent mother did not believe that he had abused Cathy, and continued a relationship with him; (3) both respondents used improper discipline on the minors; and (4) both respondents had abandoned the children.
Preliminarily, we observe that the record on appeal contains several earlier orders with findings of fact that pertain to the grounds alleged for termination of parental rights. Earlier adjudication orders may be admitted and considered by the trial court in a termination of parental rights proceeding. In reBallard, 311 N.C. 708, 713-14, 319 S.E.2d 227, 232 (1984). Although Ballard dealt with termination on the ground of neglect, this Court has held that "the law and reasoning of Ballard apply equally when parental rights are terminated pursuant to a finding of abuse." In re Alleghany County Dep't of Social Services v. Reber, 75 N.C. App. 467, 470, 331 S.E.2d 256, 258 (1985), aff'd (mem.) per curiam, 315 N.C. 382, 337 S.E.2d 851 (1986). If the trial court admits earlier adjudication orders, the parties may be estopped from relitigating the abuse and neglect issues decided in the previous proceeding. In re Wheeler, 87 N.C. App. 189, 194-95, 360 S.E.2d 458, 461 (1987). Further, the trial court may incorporate by reference an earlier adjudication order, and may adopt its findings of fact. In re Reyes, 136 N.C. App. 812, 814-15, 526 S.E.2d 499, 501 (2000). In the instant case, the trial court's orders on termination of parental rights neither incorporate by reference any prior adjudication order, nor state that any particular finding of fact is made because it had been conclusively established by virtue of a previous order. Even if the trial court had done so, this would not replace the court's duty to make an independent determination of the existence of one or more of the grounds for termination, or to make "specific findings of the ultimate facts established by the evidence, admissions and stipulations which are determinative of the questions involved in the action and essential to support the conclusions of law reached." Moore v. Moore, 160 N.C. App. 569, 571, 587 S.E.2d 74, 75 (2003) (citation and internal quotationmarks omitted). Accordingly, the mere presence in the record of orders, which the termination order does not incorporate or refer to, does not add any weight to the court's conclusions, and these other orders in the record are therefore not considered by this Court in its review of whether the trial court's conclusions are supported by its findings of fact.
Turning back to the termination of parental rights orders on appeal, neither the court's findings of fact in either termination of parental rights order, nor the evidence presented at the adjudication hearing, establishes the essential fact that respondent father had sexually abused Cathy. Also, the significance of respondent mother's maintaining a relationship with the father and her "refusal to believe" that he had abused Cathy necessarily depends upon a finding, based on clear and convincing evidence, that he had in fact sexually abused Cathy. Further, the orders do not include findings of fact on improper discipline by respondents or other deficiencies in parenting skills sufficiently significant to constitute neglect or abuse within the statutory definition. Finally, the fact that the parents drove past the juvenile's foster home and "scared" them does little on this record to support a conclusion that respondents neglected or abused the children.
Considering the four corners of the orders on termination of parental rights, we conclude that the findings of fact consisted largely of a recitation of the observation and testimony of DSS employees and others, and that the remaining findings of fact areinadequate to support its conclusions that either respondent neglected or abused the minor children.
Though not essential to our holding, we note the following because these same issues may be implicated upon remand.
First, we agree with respondent father that the trial court erred in finding of fact 36, insofar as it found that he was "ordered to have no contact with the children until he had enrolled in a sex offender evaluation." (emphasis added). There is no evidence in the record to support a finding that father was court-ordered to enroll in a sex offender evaluation. First, the trial court's termination of parental rights order did not incorporate prior court orders. Further, none of the prior orders in the record even include a requirement that respondent father obtain sex offender evaluation or treatment. Indeed, in the only prior order that mentions sex offender treatment, the recommendation is crossed out and replaced with an order that he have no contact with the children. Likewise, the testimony of DSS social worker Margie Ellison does not support the court's finding. Ellison testified that she had told respondent father "what the [c]ourt had ordered in the past" about sex offender treatment. However, there is no indication in her testimony or elsewhere of what, if anything, the court had ordered "in the past."
We next address respondents' argument that the trial court erred by refusing to allow Cathy to testify during disposition, either in open court or in chambers. Respondents sought to offerthe testimony of Cathy during the disposition phase. The trial court conducted a voir dire, in which the court received testimony from two witnesses: the guardian ad litem (GAL), Janet Dyer, and the GAL's supervisor, Lynn Wentworth. The parties and the trial court were in agreement that the purpose of this hearing was to determine whether respondents should be excluded from the courtroom during Cathy's testimony:
COURT: The question before the Court now is not will I hear from [Cathy]; I will. It is not whether the lawyers will hear what she has to say; they will. The simple question for me to exercise my discretion with at this point in time is whether or not it's in the best interest of [Cathy] to testify in this hearing in front of [respondents].
(emphasis added). After the hearing, the trial court ruled that respondents could not call Cathy to testify. The trial court based its ruling upon its conclusions that (1) formal rules of evidence do not apply to dispositional hearings; (2) the child's best interests, rather than the parents' rights, determine the outcome of the dispositional phase; (3) the trial court's ruling that respondents could not present Cathy's testimony did not implicate the respondents' due process rights; and (4) Cathy's testimony was unnecessary because the court had "already received ample admissible testimony concerning the best interest of this child."
"[U]pon finding adequate grounds for termination of parental rights, the trial court is empowered to terminate such rights, but it is not obligated to do so if it further determines that it is not in the child's best interests to do so. . . . This determination of best interests is more in the nature of aninquisition, . . . [in which e]ither party may offer relevant evidence as to the child's best interests." In re Pierce, 356 N.C. 68, 76, 565 S.E.2d 81, 86 (2002) (citations omitted). The general rule is that a respondent has a right to offer evidence during disposition, subject to the trial court's authority to exclude cumulative or incompetent evidence:
Whenever the trial court is determining the best interest of a child, any evidence which is competent and relevant to a showing of the best interest of that child must be heard and considered by the trial court, subject to the discretionary powers of the trial court to exclude cumulative testimony. Without hearing and considering such evidence, the trial court cannot make an informed and intelligent decision concerning the best interest of the child. . . . [T]he trial court erred by not hearing all of the evidence which the mother was prepared to present to the court. . . . In spite of the fact that [various reports and recommendations were submitted to the trial court], the trial court was still required to hear and consider all of the evidence tendered to the court by the mother which was competent, relevant and non-cumulative. In failing to do so, the trial court committed prejudicial error.
In re Shue, 311 N.C. 586, 597-98, 319 S.E.2d 567, 574 (1984); see also In re J.A.O., __ N.C. App. __, __, 601 S.E.2d 226, 228 (2004) (stating that, during the disposition phase, evidence introduced during adjudication "as well as any additional evidence, may be considered[, and e]ither party may offer relevant evidence as to the child's best interests") (citations and internal quotation marks omitted).
We also note that in presiding over juvenile proceedings the trial court retains its general authority to limit the scope ofquestioning, exclude certain persons from the courtroom, or make other accommodations to the needs of vulnerable witnesses. See In re Williams, 149 N.C. App. 951, 960, 563 S.E.2d 202, 207 (2002) (upholding termination of parental rights where trial court allowed minor to testify in chambers, outside respondent's presence). In Williams, this Court held:
The [trial] court deemed it was in [the child's] best interests not to have respondent present in chambers during its questioning of the child. . . . Nevertheless, the court did allow all three attorneys, including respondent's attorney, to be present in chambers and gave each attorney ample opportunity to question [the child]. Since respondent's interests were represented by his attorney in chambers and the court's assessment of what was in [the child's] best interests was reasonable, we find no error.
Id. Thus, the trial court may establish "ground rules" for the questions for the juvenile.
We conclude that the trial court erred by denying respondents' request to offer Cathy's testimony during the disposition phase. The trial court correctly observed that determination of a juvenile's best interests is in the trial court's discretion, and is not the juvenile's decision. However, under Shue, and cases decided thereafter, the trial court must first consider relevant, competent evidence offered during disposition.
We conclude the trial court's findings of fact do not support its conclusions of law. Therefore, the orders for termination of parental rights must be reversed and remanded for proceedings not inconsistent with this opinion. Upon remand, the trial court has discretion to consider additional evidence during the adjudicatoryand disposition phases of the termination of parental rights proceedings. Given our holding, we not reach respondents' remaining assignments of error.
Reversed and remanded.
Judges TYSON and BRYANT concur.
Report per Rule 30(e).

To protect the privacy of the minor children, they are referred to in this opinion by the pseudonyms Ivan and Cathy.

"Recitations of the testimony of each witness do not constitute findings of fact by the trial judge, because they do not reflect a conscious choice between the conflicting versions of the incident in question which emerged from all the evidence presented." Moore v. Moore, 160 N.C. App. 569, 571-72, 587 S.E.2d 74, 75 (2003) (quoting In re Green, 67 N.C. App. 501, 505 n.1, 313 S.E.2d 193, 195 n.1 (1984)).

For the purposes of this appeal, we have treated the findings generously, treating as actual findings certain portions that may merely be recitations of what certain other individuals observed, stated or concluded.